LEROY ANDERSON, Appellant, *v.* NEW YORK TELEPHONE COMPANY, Respondent.

Fourth Department, July 6, 1973.

*A. E. Schulgasser* for appellant.

*Phillips, Lytle, Hitchcock, Blaine & Huber* (*Charles Ryan Desmond* of counsel), for respondent.

GOLDMAN, P. J. Plaintiff appeals from a judgment dismissing his complaints on defendant's motion at the close of all the evidence upon the joint trial of his two libel actions. The appeal presents the question of the propriety of the trial court's action in denying the jury the right to pass upon the liability of defendant telephone company for the transmission by one of its subscribers of allegedly defamatory recorded messages concerning the plaintiff.

The plaintiff was appointed in 1968 Presiding Bishop of the Church of God in Christ in Western New York, a lifetime position. He had been a student minister in his youth in this church and has continued as a minister therein to the present day. For over 15 years he has served as pastor of the Prince of Peace Temple in Buffalo, and he still continues in that capacity. In

January, 1969 he had 65 churches under his jurisdiction. The plaintiff, 51 years of age at the time of the trial, has been married for about 30 years and he and his wife have five daughters, some of whom still live at home. There was evidence that some members of the Church of God in Christ were jealous of plaintiff's appointment as Presiding Bishop.

Prior to January, 1969 one Donald L. Jackson, a resident of Buffalo, New York, was a local sponsor of the organization, "Let Freedom Ring", and was president of the Donald L. Jackson Foundation, which he founded. He broadcasted weekly over station WWOL in Buffalo and during the period hereinafter mentioned urged his listeners to call two telephone numbers. Upon calling these listings one would hear recordings of various messages which Jackson and his organizations wished to disseminate. In order to accomplish this he arranged to have the defendant attach to his telephones a special piece of equipment, a connecting unit, which enabled his recordings to be heard by anyone who called either of his telephone numbers.

Jackson made recordings of alleged facts about the plaintiff and on January 14, 1969 he made one available to the public by inviting anyone interested to telephone either one of his two telephone numbers. He advertised the numbers and the subject, and he or others in his behalf telephoned members of the plaintiff's church and urged them to call Jackson's telephone numbers to hear the recording. Jackson even personally called plaintiff and told him to call the number.

On January 14, 1969 plaintiff called one of Jackson's telephone numbers and heard the first recording. After urging hearers to send badly needed donations, which would be tax free, to the Jackson Educational Foundation at Jackson's home address the recording stated that plaintiff, pastor of the Prince of Peace Church of God in Christ (giving the address of the church and also plaintiff's home address), is "the father of a number of children by other girls", naming two streets where two of the girls allegedly then lived; that plaintiff contributes less than $600 per year for each of such illegitimate children and no support for the mothers, and that "the Welfare" is paying for the remainder of the support for the children and mothers despite plaintiff's annual earnings of between $15,000 and $25,000 and his wife's earnings as a school teacher; that the Mayor of North Tonawanda paid for a trip for the plaintiff to the Holy Land, but the money might better have been given to plaintiff's illegitimate children; that it is hard to believe that a church group who follows Jesus "would have such a man as their leader";

that plaintiff's church should accept the responsibility of supporting plaintiff's "young lady and her children" and take them off Welfare; and the recording stated that "there is much, much more about this bishop to come". Jackson gave his name and address as sponsor of the recording and urged his listeners to continue to call the two telephone listings.

Upon hearing the recording plaintiff and some of the ministers of his jurisdiction went to the Department of Social Services of Erie County and inquired about the department's records of payments received from plaintiff or of welfare payments made in his behalf. At his request that department wrote a letter, dated January 14, 1969, stating that it had no record of plaintiff as a putative father or otherwise. Plaintiff then went to a local office of the defendant telephone company where the person in charge, after calling Jackson's number and listening to the recording, referred plaintiff to defendant's manager in the Buffalo area, a Mr. Jakes. Plaintiff and six of his ministers saw Mr. Jakes the next day, January 15, told him that the company's representative at the downtown office had sent plaintiff to him, called his attention to Jackson's recording and showed him the letter from the County Department of Social Services. Plaintiff told Mr. Jakes that the recording was false and a malicious lie, that plaintiff was a married man with five children and his wife a public school teacher; that he was the Presiding Bishop of the churches of his denomination in western New York and that the recording was a serious reflection upon him personally and professionally; and he asked that the defendant stop the transmission of the recording. Mr. Jakes telephoned Jackson's number and listened to the recording. He then said, "We'll get ahold to Mr. Jackson and see if we can have this discontinued"; and he said that he would call the defendant's attorneys in New York City. Nevertheless, that recording continued to be sent out over Jackson's telephone through January 16. During those three days plaintiff's wife and daughters heard the recording, as did most of the ministers of plaintiff's jurisdiction and a great many of the parishioners.

Beginning on January 16, 1969 Jackson disseminated a second recording from his two telephone numbers, stating that a certain clergyman was complaining that Jackson has "brought certain facts to your attention" and "he has complained and he claimed harrassment"; that "it is shameful that certain ministers of the Church of God in Christ is [sic] having sexual relations with certain members of their church, getting these young girls pregnant and then instructing these girls to apply

for Welfare aid ''. He continued, '' if the minister is going to get these girls pregnant, he should be made to take care of these girls and not the taxpayers. I think that [it is] the community's responsibility to run these two-bit phony preachers out of our community. * * * How can then the blind lead so many that is being led today? I hope that you will re-evaluate your leadership within your group ''. This second recording was heard from Jackson's telephone daily on and after January 16 through January 22.

On January 23, 1969, and continuing thereafter to February 9, Jackson disseminated a third recording over his two telephone lines. It stated that the '' controlled news media will not reveal crimes committed by certain clergy ''; that '' one pastor had a daughter by a girl in the church, and then the daughter became 16 years old, and he had a baby by his daughter ''; that '' while a soldier was fighting in Vietnam the pastor of the Church of God in Christ put his wife out and started living with the son's wife and had a baby by her ''; that Biblical King Herod took his brother's wife, and when John the Baptist accused him of adultery, the King had him '' arrested and put away for he was afraid of informing the public of his sins ''; and that '' Bishop Anderson [the plaintiff] and some of his members certainly has [sic] the same idea today ''.

At about this time plaintiff retained an attorney who went with him to defendant's Buffalo main office and talked with a Mr. Trammell, defendant's supervisor of operations. They requested Trammell to call Jackson's number to learn of the libel first hand and to terminate Jackson's recording service. He refused to call the number or cancel the service indicating that he had been informed of the recordings by defendant's employee, Mr. Jakes, to whom plaintiff had earlier complained of the alleged libels. Failing to secure any relief in Buffalo, plaintiff's attorney contacted defendant's attorneys at defendant's main office in New York City and pursuant to appointment went there on February 17, 1969 to confer with defendant's New York counsel in an effort to have the transmissions of the libels stopped. Despite the continuing protests of plaintiff and his attorney, the telephone company did nothing to stop the recordings nor did it make any effort to ascertain the truth or falsity of the messages which were being transmitted over its equipment.

Beginning on February 9, 1969 and continuing through February 20, Jackson disseminated a fourth recording about plaintiff. It stated that '' the spirit of God is missing '' in one of the churches of God in Christ whose leader is '' a vicious devil and

has the reputation of being a notorious liar "; that " last year this Bishop was with another minister's wife from Texas, using a parking area in Amherst, New York for a lover's lane "; that " four years ago a young girl gave birth to a baby [and] told her father that the Bishop was the father of her child "; that the church is " led by a notorious liar and devil "; and the recording stated that the Bishop cannot lead his parishioners to salvation. It concluded, as did all Jackson's broadcasts, by asking for contributions to Jackson's Foundation, a tax-exempt organization.

Beginning on February 20, 1969 and continuing through the remainder of the month of February, Jackson disseminated a fifth recording about the plaintiff, reporting that a large number of ministers had met and voted that he should resign and that they had sent their action to the National Headquarters of the church in Memphis, Tennessee, demanding that plaintiff's " election be withdrawn because of Bishop Leroy Anderson's bad reputation within the church and outside of the church ".

After the dissemination of the first two recorded messages plaintiff, on January 24, 1969, instituted an action to recover damages for libel. In May, 1969 at the annual meeting of plaintiff's 65 churches in western New York, 26 of them voted to leave plaintiff's jurisdiction and to form a second New York jurisdiction of their own. Thereafter, plaintiff initiated his second action herein against defendant for libel, including therein the two recordings referred to in the first action and the three later recordings as set forth above, alleging that he had suffered humiliation, disgrace, mental anguish, physical illness and damages to his reputation and his professional status and that he sustained monetary loss as a result of the dissemination of such recordings.

Defendant admits that it was notified of the recordings at an early stage. It contended upon the trial, however, and contends upon this appeal, that as a public utility it operates under established government tariff rules and regulations and that it, therefore, had no right to terminate Jackson's services; that it has a qualified privilege; that it acted in good faith without malice; and that plaintiff, therefore, has no cause of action against defendant.

At the conclusion of all the evidence, the trial court directed a verdict for defendant on the grounds that defendant had not published the scandalous material and had no right to interfere with the communications of one of its subscribers unless the

material was obscene, profane or otherwise illegal. We cannot agree with the court's determination.

As support for their position, the dissenters have adopted the rule suggested by section 612 of the Restatement, Torts 2d, Tentative Draft No. 12, which has come to be applied in situations concerning defamatory statements communicated in telegraph messages. In our view the recurring nature of the defamatory remarks herein makes such a rule inapplicable. As noted by the dissent, the underlying rationale of the Restatement rule concerns the requirement that a public utility is directed to transmit messages with celerity and therefore without sufficient opportunity to investigate the possible defamatory content of the material transmitted. Insofar as this rationale is applicable to telegraph communications, we do not quarrel with the principle of the Restatement rule. However, in the instant case the defendant had ample and sufficient opportunities to investigate the possible defamatory nature of the transmissions, and it was proved that despite such opportunities it failed to make any investigation whatever into the charges of defamation lodged by the plaintiff. Applying the Restatement rule to the facts in the case at bar fails to provide persons being continuously defamed with any recourse against a telephone company for recklessly permitting defamation to continue after the alleged defamation has been brought to its attention and after the company has had an abundance of time in which to investigate the possible defamatory nature of the material being transmitted. We are not here dealing '' with ' hot news ' events in process and of immediate public concern. The publisher was acting with exceedingly limited deadlines '' (*Miller* v. *Argus Pub. Co.,* 79 Wn. 2d 816). While the defendant cannot be charged with the duty to require Jackson to halt immediately the taped broadcasts, it could not under the circumstances adopt a do-nothing policy. This was not '' hot news '' which had to be immediately disseminated or lose its value. This sense of urgency is not present in the instant case and time was not of the essence (see *O'Brien* v. *Tribune Pub. Co.,* 7 Wash. App. 107).

The problem with this '' derivative '' privilege accorded the telephone company by the rule is illustrated by a situation where a mentally deranged or deceased person, or one who cannot be located, makes a recorded message believing it to be true at the time made. Such an individual might retain his privilege even after it became clear to everyone else, including the telephone company, that the message being transmitted was

false. Under the dissent's application of the rule it would be impossible to destroy a sender's privilege once he had died, disappeared or had lost control of his reasoning faculties. The telephone company, however, thus shielded from liability, could continue to transmit with impunity regardless of its own actual knowledge of the complete falsity of the defamation.

Furthermore, even if the sender is alive, of sound mind, and has not disappeared, the burden thus placed upon a person alleging defamation is practically insurmountable under the rule adopted by the dissent. Not only must it be shown that the sender is without any privilege, but also that the agent transmitting the message knew or had reason to know that the sender was not so privileged, before the telephone company could terminate the defamatory transmissions. Such a rule would leave a telephone company virtually powerless to control even the most vile, totally false and malicious recorded messages being carried over its lines and would leave the defamed individual in an equally hopeless and helpless position. Applying this dilemma to the plaintiff, his legitimate interest and stake in his reputation and good name would be totally eclipsed by this impotency of defendant. Nor do we find the argument that a telephone company is without authority to terminate service in such a situation persuasive. '' The general rule that a public utility has the right to refuse, or discontinue, service involving the transmission of a message that is obscene, slanderous, blasphemous, libelous per se, indecent, or the like, has been applied to both telephone and telegraphic services.'' (32 ALR 3d 1041, 1042.) Reference to Public Service Commission Tariff No. 800 reveals that '' In the event of prohibited, unlawful or improper use of facilities or service * * * the Telephone Company may, without notice, terminate the service, and sever the connection and remove its equipment from the subscriber's premises ''. The defendant, at the very least, could have removed its special equipment which it installed and which made the dissemination of the recorded messages possible. This could have been done without any interference with Jackson's telephone service. His lines would remain intact, but his ability to continue the slanderous broadcasts would be halted. Certainly the substance of the recorded messages should have alerted defendant to the possibility of '' improper use of facilities ''.

In our view a more proper and reasonable rule should be as follows: a telephone company should be liable to a person defamed by a recorded message transmitted over the company's

lines if it were established that the defamatory falsehood was transmitted by the company ''with knowledge that it was false or with reckless disregard of whether it was false or not'' (*Rosenbloom* v. *Metromedia, Inc.*, 403 U. S. 29, 52; *Time, Inc.* v. *Ragano*, 427 F. 2d 219, 221). There would be no liability and, therefore, no obligation to remove the sender's telephone so long as the telephone company, either because of its own independent investigation into the facts or because of the reliable nature of the source of the broadcast, had a reasonable belief that the material being published was true (*St. Amant* v. *Thompson*, 390 U. S. 727).

However, assuming the telephone company satisfies itself as to the defamatory nature of the material and does remove the telephone, the sender could recover against the telephone company for its wrongful removal only if he can prove that the message transmitted was true, or that at the time of publication he did not recklessly disregard the truth or falsity of the statements contained in the message. If the sender satisfies this burden, the telephone company in order to free itself from liability would then be required to prove that at the time it removed the telephone it did not recklessly disregard the truthfulness of the message in question. Therefore, unless the sender is a highly reliable individual, the company would have an obligation to investigate before removing the telephone. In any case a minimal investigation would require that the company contact the sender of the message, as he would be in the best possible position to supply evidence of the truthfulness and propriety of the message. This duty is not an unreasonable or onerous one to place upon a public utility such as the defendant whose revenues are annually billions of dollars.

It must be emphasized that where the company has investigated the message and found even a small evidence of truth, it should not remove the telephone. It need not fear liability in such an event since the telephone company's investigation, coupled with even the minimum evidence of truth, would be sufficient to show that there had been no reckless disregard of the truth, and hence no liability for defamation.

A deterrent to the too hasty removal of service would be to cast liability upon the telephone company for such removal if it can be proved that it recklessly disregarded the truthfulness of the message. As stated above, a failure to contact the sender would generally indicate that the telephone company acted recklessly, since the best evidence of truthfulness or falsity would usually come from that source. And conversely, the

failure of the sender to supply information supporting the truthfulness of its message would be a strong indication that the company did not act recklessly in removing the sender's telephone service.

In the instant case, the record contains sufficient evidence that the defendant transmitted the allegedly libelous messages with reckless disregard of whether they were true or false and therefore the Trial Judge erred in not permitting the case to go to the jury on the question of malice. Upon hearing the recorded messages, the plaintiff immediately notified the defendant and asked that it stop the libelous transmissions. For several days the plaintiff made substantial efforts to convince the telephone company that the statements made in the recorded message were false and should be terminated. As indicated above, plaintiff's attorney, in addition to his visits to the defendant's main office in Buffalo, traveled to New York City to confer with the telephone company's New York counsel in an effort to have the transmissions terminated.

The only action taken by the defendant in the instant case was the act of its agent in dialing the telephone numbers in question and hearing the allegedly libelous statements. Defendant does not dispute the fact that it had knowledge of the contents of the recorded messages, nor did it present any evidence at trial that sought to establish that the slanderous and scurrilous remarks made on the recordings concerning the plaintiff were true. After hearing the recordings, the telephone company had probable cause and reason to believe that statements so wholly condemnatory of character might be untrue. Is it unreasonable to hold that after hearing the tapes the burden shifted to the defendant, at the very least, to make even a cursory investigation? The very serious nature of the charges contained in the messages should have activated defendant to question their legitimacy. Was it not an abuse of its privilege for this public utility to do nothing? The First Amendment is not a shield against reckless and irresponsible conduct by a public utility.

Furthermore, the libelous material in the instant case did not emanate from a reliable source, as was the case in many of the authorities relied upon by the respondent. In *New York Times Co.* v. *Sullivan* (376 U. S. 254, 287), for example, the Supreme Court of the United States found it significant that the newspaper had relied on the good reputation of many of those listed as sponsors of the advertisement in question. In addition, the court in *New York Times Co.* v. *Sullivan* (*supra*, p. 286) con-

cluded that the newspaper's opinion that the advertisement was substantially correct was "at least a reasonable one, and there was no evidence to impeach the witness' good faith in holding it".

In the instant case the reputation of the organization sponsoring the recorded messages, "Let Freedom Ring", was at best unknown and at worst highly suspect. The condemnatory nature of the messages in question would put any reasonable person on notice that the truth of said messages was open to doubt and probably libelous. The denials by plaintiff and his efforts to convince the defendant that the recordings were libelous should have alerted the telephone company that the statements made about the plaintiff were probably untrue, or at the least to have activated it to make even a slight investigation.

Yet, despite the defamatory nature of the messages, the questionable or at least unknown reputation of the sponsoring organization, and the immediate and vehement denials of the plaintiff and his attempts to prove that the statements were libelous, the respondent telephone company made absolutely no attempt to check the veracity of the statements being made over its lines and its additional equipment. Mr. Dallas Trammell, the division commercial supervisor of the telephone company, handled the plaintiff's complaint. He testified that he advised the plaintiff that there was no basis to terminate the recording. He further testified that he made no effort to contact Mr. Jackson, the sender, and he did not know whether any other telephone company employee made such an effort either. The record shows none. Regarding the truth of the recordings, Mr. Trammell testified as follows:

"Q. During that period, Mr. Trammell, did anyone offer you any proof of the truth of these recordings?

"A. No, nor did I ask for any."

In the posture in which this appeal reaches us, the dismissal of the complaint at the close of all the evidence, the underlying facts and all the inferences to be drawn from them must be viewed in the light most favorable to the plaintiff. The burden of showing that no genuine issue of material fact exists is certainly upon the defendant. Although this may not be the kind of a question which should be measured by the reasonable, prudent man test, nevertheless, the query is: did the defendant, as a public utility, by its absolute and complete failure to make any inquiry under the particular facts in the record before us act recklessly? Having heard the tapes and after the repeated

complaints and warnings of plaintiff and his attorney, should not the defendant have entertained doubts as to the veracity or falsity of the statements being broadcast over its equipment? Was not the very credibility of the witnesses, coupled with defendant's calloused inaction, a question upon which the jury should have been permitted to pass in determining malice by reason of reckless disregard? " Such ' reckless disregard ' may be shown circumstantially, if the evidence demonstrates that the existence of a good faith belief in the truth of the material was highly improbable, *ibid.* at 732, 88 S. Ct. 1323. The credibility of a claim that the publisher's failure to suspect falsity was in good faith and not reckless is a question of fact, which may depend on the circumstances surrounding publication, the reliability of sources, the opportunity available to investigate, and the urgency of publication, as well as the degree of sensationalism, from which improbability may be inferred and which may also increase the likelihood of damage to the individual defamed." (*Blanke* v. *Time, Inc.,* 308 F. Supp. 378, 380.)

In the light of the fact that: (1) the recordings appeared libelous on their face; (2) the source from which the recordings emanated was at best unknown to respondent and at worst of questionable reliability; and (3) the respondent made absolutely no attempt to verify the accuracy of any portion of the apparently libelous recordings, a jury question was raised by the plaintiff regarding the respondent's malice. The jury could have found that there was " clear and convincing proof that the defamatory falsehood was published * * * with reckless disregard of whether it was false or not " (*Rosenbloom* v. *Metromedia,* 403 U. S. 29, 52, *supra*).

The judgment should be reversed and a new trial granted.

Witmer, J. (dissenting). As much as I sympathize with the plaintiff and his plight in this case, I must dissent from the court's holding in his favor. The larger issue of the public policy involved, founded upon the First Amendment of the United States Constitution, transcends the wrong done to plaintiff herein, if it was such, and requires affirmance of the judgment. The appeal presents the question of the liability of a telephone company for the transmission by one of its subscribers of allegedly defamatory recorded messages concerning the plaintiff.

Since the trial court dismissed the two complaints on defendant's motion at the conclusion of the testimony, holding that there was no question of fact for the jury, in considering this

case we must, of course, accord to plaintiff every favorable inference which a jury could draw from the evidence. I accept the statements of facts contained in the majority opinion and make the following additions thereto:

(1) Before plaintiff requested that the telephone company terminate Jackson's service he had unsuccessfully sought an injunction and action by the city Police Department against Jackson. Plaintiff was advised by counsel that injunctive relief against Jackson was not available under our law (see 34 N Y Jur, Libel and Slander, § 6) and was advised by the Police Department that they had no authority to restrain Jackson's messages. He then turned to the telephone company, the defendant, to request that it impose the restraint that the law otherwise had made unavailable to him.

(2) Defendant's attorneys advised it that it had no right or duty to interfere with Jackson's use of his telephones for transmitting said recorded messages.

(3) At trial plaintiff testified that he had known Jackson " quite well " over a number of years. Although Jackson was not a member of plaintiff's church, plaintiff had determined that " some of the ministers [within plaintiff's diocese] had made contact with him [Jackson] ", and he had heard that those ministers fed information to Jackson. This internal controversy, which plaintiff described as " a political church football ", developed within plaintiff's church after his appointment as bishop in 1968, before any of the recordings that are the subject of this action. Plaintiff conceded that many of the details in the recordings, other than the accusations of adultery and other scandalous behavior, were accurate and might suggest that someone with knowledge of plaintiff's activities had authored the statements. Two of the ministers within plaintiff's jurisdiction, both of whom had known plaintiff, testified in his behalf that they had believed the statements made by Jackson. Jackson, subpoenaed by defendant, testified that he had known plaintiff for some time, had talked with people from Memphis, the headquarters of plaintiff's church, and " knew this information." Plaintiff did not exercise his right to cross-examine Jackson concerning the sources of his knowledge.

In light of these facts and the applicable law I believe that the trial court achieved the correct result.

The telephone company cannot be liable to plaintiff under the law of defamation unless it is held that by providing service to Jackson it " published " his messages and did so under circum-

stances such that the " publication " was not privileged. In my view neither of such holdings can be made on this record.

Although it is recognized that a *telegraph* company may be held to have published a message submitted to it by a sender (*Klein* v. *Western Union Tel. Co.*, 257 App. Div. 336, 339–340, app. withdrawn 281 N. Y. 831; see, Smith, Liability of a Telegraph Company for Transmitting a Defamatory Message, 20 Col. L. Rev. 30, 33–50 [1920]), such publication occurs through the direct participation of agents of the telegraph company. Thus, when the telegraph sender submits a message to agent A who transmits it to agent B who delivers it to the recipient, agent A has communicated the message to agent B and agent B has communicated the message to the addressee. In the case of a modern-day *telephone* call, however, the caller communicates directly with the listener over the facilities of the telephone company, with no publication by the company itself. Whether the caller uses his own tape recorder or leases facilities from the telephone company to permit him to transmit the same message on a continuous basis, the legal significance of the communication is the same. The sender's message in such cases is communicated directly to the recipient without being published by or to any person employed by the telephone company. The telephone company's role in this communication is not legally different from the role played by a person who leases a sound amplification system to a person who makes a defamatory public speech, or who leases a typewriter to one who writes defamatory messages or a tape recorder to one who broadcasts a defamatory message. In none of these cases does the mere leasing of communication facilities cast the lessor in liability under libel laws, even if the lessor is informed about the nature of the message being communicated. In no sense has the person providing the facilities participated in preparing the message, exercised any discretion or control over its communication, or in any way assumed responsibility. For these reasons, there has been no publication in the present case, because the telephone company was not the legal cause for communicating the defamatory matter to third persons.

If, however, we were to hold that the telephone company published Jackson's messages because it allowed him to use its facilities to transmit the messages (or, more precisely, because it refused to terminate his telephone service) (see Restatement, Torts 2d, § 581, Comment *b* [Tentative Draft No. 12, 1966]), we should do so only in conjunction with the corresponding rule extending a broad conditional privilege to the

telephone company. Thus, we should follow *Matter of Figari* v. *New Yor Tel. Co.* (32 A D 2d 434, 445–447) and *Klein* v. *Western Union Tel. Co.* (257 App. Div. 336, 339–340, app. withdrawn 281 N. Y. 831) in extending to public service telecommunication companies the qualified privilege that has been redefined, without change material to this action, in Restatement, Torts 2d (§ 612, Tentative Draft No. 12 [1966]) as follows:

'' (2) A public utility under a duty to transmit a message is conditionally privileged to do so, even though it knows the message to be defamatory, unless

'' (a) the sender of the message is not privileged to send it, and

'' (b) the agent who transmits the message knows or has reason to know that the sender is not so privileged.''

The reasons for the qualified privilege are explained in *Klein* v. *Western Union Tel. Co.* (*supra*) where the court wrote:

'' this defendant is placed in a precarious position with respect to its refusal to accept, transmit and deliver messages proferred to it with a tender of the proper charges  *  *  *. If the defendant at its peril is required to censor messages which contain statements of fact or innuendo about a third party of the character of the messages here sent, it would subject itself to a possible suit on the part of the sender, either by reason of its refusal to accept or for the delay occasioned by its investigation  *  *  *  (p. 339).

'' We are of opinion that ordinarily such a company, in accepting, transmitting and delivering messages, is entitled to a qualified privilege. This rebuts any presumption of malice from the fact that the message is libelous *per se* as between sender and the party mentioned therein, and, in order to justify a recovery, *the party libeled must furnish evidence of actual or express malice or bad faith on the part of the carrier* '' (pp. 339–340; emphasis supplied).

(See, also, *Western Union Tel. Co.* v. *Lesesne*, 182 F. 2d 135, 137 [4th Cir.], cert. den. 344 U. S. 896; Smith, Liability of a Telegraph Company for Transmitting a Defamatory Message, 20 Col. L. Rev. 30–50, 369–393 [1920]; Note and Comment, 29 Mich. L. Rev. 339–344 [1930]; 1 Harper and James, Law of Torts [1956], § 5.18, pp. 404–405.)

This qualified privilege, incorporated in the Restatement, serves to accommodate several important social policies: (1) the due process right to continued access to telephone service (*Telephone News System* v. *Illinois Bell Tel. Co.*, 220 F. Supp., 621, 625–626, affd. 376 U. S. 782); (2) the First Amendment

right of telephone subscribers to access to public communication facilities, which a public service corporation may not lightly abridge, especially where the communication concerns matters of public concern (*Matter of Figari* v. *New York Tel. Co.*, 32 A D 2d 434); (3) the interest of telephone subscribers in being free from excessive monitoring of their private use of telephone facilities; (4) the recognition that telephone companies do not and should not exercise editorial responsibility for the content of otherwise private messages transmitted over its lines; (5) the need to protect the telephone company from the precarious position of being subject to suit (a) by the sender for terminating or refusing service or (b) by the person defamed if the company decides to permit service to continue; (6) the recognition that it would be unwise and socially expensive to impose the burden upon the telephone company to investigate complaints about the truth of communications by its subscribers; (7) the recognition that the person defamed may enter into the public debate to protect his reputation and may sue the sender for damages; (8) the recognition that a telephone company, which with very limited exceptions extends its facilities to all users, has exhibited no actual or implied "malice" when it merely refuses to censor a particular communication; (9) the recognition that the sender acts within the scope of his First Amendment privilege as long as he has not, to the telephone company's knowledge, recklessly disregarded the truth and hence should not be penalized by the loss of telephone service for the exercise of that privilege; and (10) the recognition that the subscriber has a meritorious claim to a hearing or other independent review as to whether his conduct is protected by the First Amendment before his service may be terminated.

Applying this qualified or conditional privilege to the facts of this case, it appears that no question of fact was presented for the jury. Jackson was conditionally privileged to comment about the fitness of such a public figure as plaintiff to serve as pastor or bishop of his church (*Rosenbloom* v. *Metromedia*, 403 U. S. 29, 31–33, 43–44; *Trails West* v. *Wolff*, 32 N Y 2d 207; *Washington* v. *New York News*, 37 A D 2d 557), under standards of *New York Times Co.* v. *Sullivan* (376 U. S. 254) and *Rosenbloom* v. *Metromedia* (*supra*), so long as he did not act with knowledge that the defamatory statement was false or with reckless disregard of whether it was false. Although evidence was introduced to show both that plaintiff had met with representatives of defendant to deny the truth of Jackson's messages and had supported portions of these denials with a

letter from the Welfare Department and that defendant had made no investigation to determine the truth of the messages, nothing was introduced to establish that defendant had affirmative reason to know whether Jackson had knowledge of the falsity of the statements or had acted in reckless disregard for their truth or falsity. At trial plaintiff indicated that he believed Jackson had received information from some members of his church. Jackson stated that he talked with some persons in Memphis, Tennessee, but he relied principally upon his own personal knowledge of plaintiff. The evidence did not show more than that at the time of the publication defendant had been presented with assertions and possibly reasonable suspicions that Jackson's messages may have been untrue in certain respects. At the same time the telephone company had plaintiff's admission that many of the statements contained in the recorded messages were true. Had defendant inquired of Jackson about the statements which plaintiff asserted were untrue, presumably Jackson would have given assurance of their truth just as he testified upon the trial. It is noteworthy that plaintiff did not cross-examine Jackson on the trial as to the truth of those statements and the source of his knowledge thereof; and even some of plaintiff's ministers testified that they believed the statements were true. Thus, there was no showing that Jackson exceeded his qualified privilege. Under such circumstances, even if we hold that the telephone company was a publisher of Jackson's messages, the company was entitled to rely on Jackson's qualified privilege (*Youmans* v. *Smith,* 153 N. Y. 214, 222).

The evidence was clear that defendant refused to interfere with Jackson's messages because it had been advised by counsel that it had no legal right to interfere. Moreover, plaintiff has failed to furnish evidence of " actual or express malice or bad faith " of the defendant, within the meaning of *Klein* v. *Western Union Tel. Co.* (257 App. Div. 336, 340). Nothing in the record even raises an inference that defendant acted for any purpose or motive inconsistent with the purposes served by its qualified privilege as a public service company or that it knew or had reason to know that Jackson had exceeded his conditional privilege to publish his messages. Accordingly, there was no evidence to show that defendant abused its qualified privilege.

Although I agree with the majority's observation that the recurring nature of the defamatory remarks in this case is a factual difference from the ordinary telegraph transmission (but cf. *Matter of Figari* v. *New York Tel. Co.,* 32 A D 2d 434)

in that here the telephone company had a limited opportunity to investigate the possible defamatory content of Jackson's progressive communications, I do not believe that this fact should justify a departure from the Restatement rule in favor of the standards of *New York Times Co.* v. *Sullivan* (376 U. S. 254) and *Rosenbloom* v. *Metromedia* (403 U. S. 29). Quite apart from the problem that Jackson changed his messages, necessitating, under the majority's proposed standard, successive investigations by the telephone company and legal opinions from its counsel, I believe that there are important differences between private publishers, for whom the *New York Times* standard was adopted, and public telecommunications corporations. There is merit in the statement in Comment *g* of Restatement, Torts 2d (§ 612 [Tent. Draft No. 12 (1966)]) that, "As a public servant it [the public utility] is not required to make inquiry or investigation as to the circumstances, and the reasons or purposes for which its service is demanded". Moreover, the conditional privilege applicable to public telecommunication corporations serves purposes entirely different from those served by the *New York Times* privilege and the former has arisen from an entirely different legal background. Under the common law prior to the *New York Times* decision radio stations and newspaper publishers were held strictly liable for the republication of a defamatory statement unless they had no reason to know of its defamatory character (Restatement, Torts, § 581; 1 Harper and James, The Law of Torts, § 5.18, pp. 402–408, n. 2, 9, 10 [1956]). The qualified privilege adopted in *New York Times* was designed to accommodate the First Amendment rights of the publisher by protecting him from liability for defamation in reporting on matters of public concern, unless he acted in reckless disregard of the truth (*Rosenbloom* v. *Metromedia*, 403 U. S. 29, 52–53). Thus, that privilege was purposefully designed to accommodate the competing social policies and fundamental rights present where a publisher undertakes to report and comment on matters of public concern.

The origin of the qualified privilege which has been extended to public telecommunications corporations is entirely independent of the *New York Times* privilege, and it was developed long before the *New York Times* privilege, in recognition that such corporations are not editorially responsible for the content of the messages transmitted over their facilities, since they provide those facilities without any actual or implied malice but only in the exercise of the duty to the public which they have assumed by public charter (*Klein* v. *Western Union Tel. Co.*,

*supra*; *Western Union Tel. Co.* v. *Lesesne, supra*; Smith, Liability of a Telegraph Company for Transmitting a Defamatory Message, 20 Col. L. Rev. 30–50, 369–393 [1920]; Note and Comment, 29 Mich. L. Rev., 339–344 [1930]; 1 Harper and James, Law of Torts, § 5.18, pp. 404–405). Because the considerations of public policy for communication through the facilities of public service corporations are entirely different from the policies applicable to private publishers, it is unsound to incorporate the *New York Times* standard in this case.

The majority's expressed fear of hypothetical cases of continuing recorded libelous messages by mentally deranged or deceased persons is not well founded. First, the contract for telephone services between the subscriber and the company would not survive the death or incompetency of the subscriber, and secondly, such an occurrence to the sender of a recorded message would present no greater problem for the person defamed than does the ordinary publication of any defamatory matter. Except for situations not here pertinent, the person defamed cannot obtain a court-imposed prior restraint upon the publication (*Nann* v. *Raimist,* 255 N. Y. 307, 317; 34 N Y Jur, Libel and Slander, § 6) and must instead rely on his ability to defend himself in the forum of public debate or by means of a damage suit against the person responsible for the defamation. These familiar public policy rules, of course, represent considered judgments about the relative merits of free public debate and the individual's right to insulation from untruthful assertions (*Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 95–96; *Rosenbloom* v. *Metromedia,* 403 U. S. 29, *supra*; *Carroll* v. *Princess Anne,* 393 U. S. 175, 180–182; *Teitel Film Corp.* v. *Cusack,* 390 U. S. 139; *Freedman* v. *Maryland,* 380 U. S. 51, 57–59; *Bantam Books* v. *Sullivan,* 372 U. S. 58, 70–71).

The standard stated by the majority would be extremely difficult of application. They assert that " a minimal investigation would require that the company contact the sender [and] this duty is not an unreasonable or onerous one ", and they add that " where the company has investigated the message and found even a small evidence of truth, it should not remove the telephone." In light of the majority holding herein, that test is impractical and not useful. On a practical view of this case it would require affirmance. As interpreted by the majority, it appears that competent counsel would be hard pressed to advise the telephone company that any investigation would satisfy its burden in a particular set of factual circumstances other than the same investigation as that expected of a newspaper

publisher. In other words, the majority would impose the same responsibility upon a public telephone company as that imposed on a private organization for profit that undertakes direct responsibility for what is published and has the resources to verify its stories. That burden would be unreasonably onerous when applied to a telephone company in light of the manifest differences between the social functions of the two, particularly since the telephone company merely makes a physical service available to a customer's independent use.

The standard adopted by the majority would compel the telephone company to infringe upon the expected privacy and freedom of its subscribers. Suppose that a political party, in the course of a telephone campaign to bring its messages to the voters, were to criticize a public official by means of a form message which party workers repeated to the persons called. Suppose, further, that the public official were to complain to the telephone company that the message was not truthful in certain respects. The majority's standard would require that the telephone company monitor the messages, conduct an investigation into their truthfulness, be a fact finder, and terminate service if it appeared to the telephone company that the messages were not true. Of course, if the telephone company were incorrect in its assessment of the truth, the damage remedy available to a disappointed political candidate would be too late, uncertain and inadequate. This extraordinary prior restraint, moreover, would make the telephone company a public censor and would mean that many telephone messages would be terminated even if the sender were privileged under the *New York Times* rule to communicate them. The majority's rule, imposing an imminent penalty of loss of telephone service upon a person engaging in robust public debate, would clash severely with the rights granted under the First Amendment as interpreted in *New York Times Co. v. Sullivan (supra)*. The "derivative privilege" which the majority declines to adopt is necessary, it is submitted, to safeguard fully the First Amendment rights of the subscribers of telephone services.

Moreover, there appears to be little basis for the majority's ready assumption that the telephone company has the authority summarily to terminate the service of a subscriber who transmits messages which the telephone company believes to be defamatory, where it appears that the sender has acted within the privilege of *New York Times*. The assumption is directly contrary to *Matter of Figari v. New York Tel. Co.* (32 A D 2d 434, 448) where the court stated that: "a [telephone company]

regulation which has the effect of deterring freedom of speech, not supported by any substantial governmental interest, is unconstitutional, especially where the speech sought to be regulated, whatever vagaries it embodies, is not defamatory within *New York Times* (*supra*) and its progeny and does not incite to riot or tend to provoke immediate retaliation [citations omitted]. Our heritage commands this result since the liberties guaranteed to individuals in the First Amendment are to be accorded a most liberal construction.'' In *Figari* the court reasoned that '' it is axiomatic that the tariff of a public utility regulated by a governmental agency is efficacious only by virtue of State action '' (32 A D 2d 434, 440), and it concluded that the public utility could not apply its tariffs to infringe upon First Amendment rights (pp. 446–448). Therefore, if a telephone company could terminate service because the subscriber was transmitting a defamatory message, it certainly could not do so unless it were in a position to demonstrate that the subscriber was not privileged under the *New York Times* standard, for otherwise the subscriber has a constitutional right to publish his message without State-imposed restraint (*Near* v. *Minnesota,* 283 U. S. 697, 713–716). If we were to find that the decision of the telephone company to terminate service resulted from private action rather than State action, we, nevertheless, could not apply a State rule of law, such as that adopted by the majority, that has the effect of imposing an invalid restriction on First Amendment rights because that rule of law constitutes '' State action '' under the holding of *New York Times Co.* v. *Sullivan* (376 U. S. 254, 265–266).

I would hold that the due process clause of the Fourteenth Amendment, combined with the First Amendment, forbids the imposition of any rule of law which would require the telephone company summarily to terminate a subscriber's service without providing an opportunity for a hearing or other independent review (no provision for which has been established in the tariff regulations), when the subscriber has exercised rights arguably within the protection of the First Amendment. That conclusion appears to be the clear implication of recent Supreme Court decisions in pornography cases where the State's regulatory interests are even stronger than in libel cases but restraints on improper publications have been permitted (*Miller* v. *California,* 413 U. S. 15; *Paris Adult Theater I* v. *Slaton,* 413 U. S. 49) only upon procedures consistent with due process of law (*Heller* v. *New York,* 413 U. S. 483; *Freedman* v. *Maryland,* 380 U. S. 51, 57–59). The due process clause governs the procedures appli-

cable when State law requires a telephone company to terminate services (*Telephone News System* v. *Illinois Bell Tel. Co.*, 220 F. Supp. 621 [N.D. Ill.], affd. 376 U. S. 782, *supra*; and *Sokol* v. *Public Utilities Comm.*, 65 Cal. 2d 247, 252–256; 53 Cal. Rptr. 673) and due process requires an adversary hearing or other independent review when First Amendment rights are at stake (*Heller* v. *New York*, 413 U. S. 483, *supra*; *Carroll* v. *Princess Anne*, 393 U. S. 175, 180–182; *Walker* v. *Popenoe*, 149 F. 2d 511, 513 [D. C. Cir., 1945]; Comment, Summary Termination of Telephone Service for Suspected Illegal Use, 20 Stanford L. Rev., 136, 142–145). Thus, there are grave constitutional objections to holding that any tariff regulation could validly give the telephone company the right summarily to terminate service because allegedly defamatory messages are being transmitted.

We are bound, therefore, to construe the tariff so as to avoid an unconstitutional result. The language used in subdivision 5 of Tariff 800 leads to the conclusion that the term "improper" does not refer to defamatory messages. The term is used in conjunction with the words "prohibited" and "unlawful" uses of facilities, and the examples presented are similarly limited. Thus, "improper" appears to mean uses of the telephone services involving criminal activities, including fraud upon the telephone company. It would be difficult to extend the meaning of these terms to communications involving only civil liability for the sender. If defamatory statements are "improper", then how must we construe telephone calls that are the operable facts in breach of contract, negligent misrepresentations, or deceit? Furthermore, even if we were to hold that some telephone uses giving rise to civil liability were "improper", we should not find it "improper" for the user to exercise a freedom of expression protected by conditional privilege.

Finally, it must be observed that the majority have not explained how the failure of the telephone company to undertake minimal investigation is a legal cause of plaintiff's damages. This record permits only the inference that if the telephone company had called Jackson it would have been told that Jackson had known plaintiff for some time, had talked with people in the church, and "knew this information." If it had checked with members of plaintiff's church, it would have learned that the subject was, in plaintiff's words, "a political church football." Presumably, this investigation would constitute grounds for the telephone company to continue Jackson's service. There-

fore, even if we were to adopt the standard advocated by the majority, we should not reverse because there was no evidence to show that the publication would not have continued but for the failure of investigation.

For the above reasons the judgment appealed from should be affirmed.

CARDAMONE and SIMONS, JJ., concur with GOLDMAN, P. J.; WITMER and MOULE, JJ., dissent and vote to affirm judgment in opinion by WITMER, J.

Judgment reversed on the law and facts and a new trial granted with costs to abide the event.